UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-133 (DWF/DTS)

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

                                        **GOVERNMENT'S POSITION WITH**
                                        **RESPECT TO SENTENCING**

NATHAN MILLER
DOBBELMANN,

        Defendant.

Mr. Dobblemann searched for prey on social media and then bombarded young girls with requests for naked photos and videos, along with graphic messages about what he wanted to do with them sexually. Even when the recipients told him to stop, told him they were minors, he continued. He has a history of solicitation and online child pornography and is a grave danger to the community. Considering this danger, Mr. Dobbelmann's offense, and his history and characteristics, the government respectfully requests a sentence of 324 months' imprisonment with at least 20 years of supervision to follow. Such a sentence accomplishes the objectives of 18 U.S.C. § 3553(a), without being greater than necessary to do so.

## Background

**a.  The federal charges – As a registered sex offender, Mr. Dobbelmann bombarded girls with requests for sexual content and asked for sex with children in a pedophile chat room.**

In early September 2020, an undercover (UC) FBI Agent in Utah started chatting with Mr. Dobbelmann on a foreign service chat room known for online child exploitation. PSR ¶ 9. At the time, Mr. Dobbelmann's identity was unknown; he was known only by his screen name, iliverichously. From the start, Mr. Dobbelmann made his interest in pedophilia very clear. He asked if he could join the UC and the UC's purported girlfriend, 9-year-old daughter and 5-year-old son in sexual activity. *Id*. ¶ 10. He wrote, "Lets see pictures and videos of your daughter, gf etc & in return I will send back the same number of myself for you!!" *Id*. He then sent the UC several explicit images with sexually explicit text. *Id*. Mr. Dobbelmann claimed that the images were him "having sex with some girls lol, 1 my xwife the other 2 were 9." *Id*.

Mr. Dobbelmann proceeded to send the UC videos of the anal rape of a child by an adult male and of naked girls spreading their legs. *Id*. He asked, "You like? Send some good onescback too please." *Id*. The UC asked if Mr. Dobbelmann had an account on Kik, another messaging application. Mr. Dobbelmann said yes, under the user name "extremepussypleaser," Dobbelmann adding, "lets see some here of your girls 1st please." *Id*.

2

The message exchanges moved to Kik, and Mr. Dobbelmann continued to solicit pictures and videos of the UC's supposed nine-year-old daughter and continued to discuss "play[ing]" with girls. *Id.* ¶ 11. Based on data the UC captured in the exchanges, the FBI identified Mr. Dobbelmann as the person behind iliverichously and extremepussypleaser. From there, search warrants on Mr. Dobbelmann's email and social media accounts showed his prolific, profligate communications with minors. His "iliverichously" Snapchat account contained approximately 16,407 unique messages dedicated almost exclusively to sexually explicit communications. *See* Ex. 1 (summary and excerpts from this account prepared by Special Agent Matthew Vogel).[1] It contained hundreds of copies of images depicting Dobbelmann masturbating, holding his erect penis, or in poses of sexually explicit nudity. *Id.*; PSR ¶¶ 16-25. Mr. Dobbelmann sent messages to dozens of accounts that belonged to users saying they were as young as eleven and he frequently asked his chat partners about their age, sexual experience, and interest in watching him masturbate. *Id.*

The following (abbreviated) exchange with Minor 1 illustrates his *modus operandi*. In March 2020, Dobbelmann contacted Minor 1 and sent an image of his erect penis with the caption "You like?" Minor 1 replied, "No I don't." *Id.* ¶ 20. Mr.

---

[1] Due to the identifying information of minors, as well its graphic nature, Ex. 1 will be emailed to Chambers with the courtesy copy of this memorandum.

3

Dobbelmann continued sending images of his penis to Minor 1 and called her "babygirl." *Id*. Minor 1 replied, "You are ah old man […] Your like 40 years old I'm 15 🙄."

This did not deter him. In April 2020, Mr. Dobbelmann tried to call Minor 1. Id. ¶ 21. He followed with a message asking, "why u hang up right away?" to which she replied, "bc ur weird asf like leave me alone fucking child molester." Id. Despite this, Dobbelmann persisted in contacting Minor 1, eventually offering her "an 8ball" (a known drug reference). *Id*. ¶ 22. Minor 1 responded to this offer asking for a meal instead: "get me food." *Id*. Consistent with his attempts to bribe minors for sexual material (*e.g.* Ex. 1 at 1-2, 11, 17, 20), Mr. Dobbelmann wrote, "Sure if ya send me some sexy naked pix&vids of yourself I'll buy you sum food no prob!" PSR ¶ 22. Minor 1 replied that if he was serious, she wanted Chipotle. Id. Dobbelmann replied, "… Go ahead and send me all the sexy naked pix&vids ya got and can take for me RN [right now] till your food arrives and tell me exactly whatcha want and the address to send it to." *Id*. Minor 1 sent her full name, phone number, and address in Ohio, followed by a series of sexually suggestive, but not explicit, images. *Id*. Mr. Dobbelmann continued insisting on more explicit images such as pictures of "you shaking that sexy ass and some brighter pix of your ass.. can barely see it." *Id*. ¶ 23.

The chat continued for several days including Dobbelmann writing "Please lemme see that sweet pussy too.. you dont gotta spread it open for me if your uncomfortable doing that on your period but still lemme see it please luv! […] Stop what your [sic] doing and go in the bathroom right now and show your awesomedaddy your sweet sexy pussy that I get to punish with the most intense pure pleasures very soon babygirl!" Id.

When Dobbelmann requested a naked video chat with Minor 1, she wrote, "I love food and you want my body so let's make a deal." Id. ¶ 24. Mr. Dobbelmann said he would do so for nudity, writing (knowing Minor 1 was 15), "I was already planning to offer to get you food once you really got on here naked with me on video chat you just gotta stop waisting time & get naked on here now." *Id.* Minor 1 said she took pictures of herself and her fifteen-year-old cousin. Id. Dobbelmann demanded, "Send all the pictures/videos you took and send your food order at the end." And Minor 1 then sent a photo purporting to be her vagina and anus. *Id.* Dobbelmann later sent a screenshot of a food order totaling $18.07. Id. This evidently continued for months, as one of Dobbelmann's email accounts showed a receipt in September 2020 for Chipotle delivery to Minor 1. Id. ¶ 25.

Also in September 2020, Dobbelmann began communicating with Minor 2 on Snapchat, saying, among other things, "send me lots of sěxý pictures/videos of you showing øff both your gorgeous face as well as much of your bødy's truly very

5

høtt & séxý bărę năkęd beauty as you possible can…"[2]. *Id*. ¶ 18. Emphasizing his request, he wrote "If you would at least be nice enough to just send AT LEAST A FEW PLEASE!!! THAT WOULD BE TOTTAL AWESOME! … You think you can handle all 10 inches of my awesome Rock hard cock that I got here for you to enjoy anytime and anyway you desire babygirl?" *Id*.

Mr. Dobbelmann continued to correspond with Minor 2 for months, until the time of his arrest, sending her hundreds of messages, many pictures of his penis, and repeatedly asking for sexually explicit videos and photos. Mr. Dobbelmann knew she was a child, as he and Minor 2 talked about her homework, her dad taking her phone away to punish her, and that she was in seventh grade. *Id*. Minor 2 eventually told Mr. Dobbelmann she was 12.

Despite knowing she was 12, Mr. Dobbelmann referred to Minor 2 as his girlfriend and talked about and reserached plans to visit her in California.  His Instagram profile said he planned "to move to California to be with the love of my life and future Wife!" Ex. 2 (screen shot of Instagram profile); Ex. 3 (Instagram direct message to unknown recipient). He bought Minor 2 lingerie and had nude images of her as his wallpaper on his mobile phone. PSR ¶ 18.

---

[2] These messages were copied directly from Snap's records and some of the Snap Chat characters do not render properly when placed in a text format.

And though he thought of himself in a relationship with Minor 2, when she disclosed being raped multiple times by a relative in California, Mr. Dobbelmann did not report this. Instead, he researched abortion clinics for her. He also continued to pimp her out for others to see on OnlyFans, a subscription service where posters sell their content, whatever it is, to their "fans" who pay for access. PSR ¶ 26. In December 2020, Mr. Dobbelmann set up an account on OnlyFans for Minor 2, using his Minnesota ID, photos of himself holding his ID, his bank accounts, and his social security number. OnlyFans rules require users to be 18, but the email for the account was Minor 2's email and profile pictures were sexual in nature and consistent with Minor 2.

Mr. Dobbelmann reported that in addition to messaging on Snapchat, he and Minor 2 communicated by text message and phone calls.

Like his Snapchat, Mr. Dobbelmann's Kik account was replete with sexually explicit messages and requests to minors. *Id*. ¶¶ 14-15. In one message to a 13-year-old, he wrote he wanted to "meet up to give that sweet tight virgin pussy a treat and have me fill it up for the 1st time with my 10 inch hard cock filling it up with loads of my cum and the most amazingly pleasurable feelings pulsating thru your entire body for many hrs …." *Id*. ¶ 15.

And as his chats with the UC vividly demonstrated, Mr. Dobbelmann did not limit his child exploitation activities to soliciting children. He also used email

7

and foreign web services to store, share, trade and discuss child pornography, joining in chat rooms frequented by pedophiles. Id. ¶ 26. Eventually, in March 2021, Mr. Dobbelmann was arrested in this case and his phones were seized. Id. ¶ 28. Forensic review found least 4,079 child pornography files in his media and accounts, including prepubescent minors and minors under the age of 12. Id.

### b. Mr. Dobbelmann's 2008 conviction and BCA investigation.

The instant case is not Mr. Dobbelmann's first time being convicted for using social media to solicit sex from a minor. Mr. Dobbelmann was convicted in 2008 in Winona County District Court of Distribution of Obscene Material in violation of Minn. Stat. §617.241 subd. 2(a). PSR ¶ 51. The charge of soliciting a child to engage in sexual conduct was dismissed as part of his plea arrangement. *Id.*

In July 2007, while working as a County Detention Deputy, Dobbelmann used Yahoo! instant messenger to ask a 15-year-old to have sex with him; specifically, to have a three-way sexual encounter with another female. *Id.* Mr. Dobbelmann asked the child if she had "any sexy nude pix I can see?" and told her it would be "way illegal" for them to have sex. ECF 29-1. Mr. Dobbelmann told the girl that he would send her photos of himself naked and having sex and emailed her four images: two of erect penises; an erect penis next to a vagina; and

a penis inserting into a vagina. *Id.*  He then asked the 15-year-old, "wanna have me inside you?" *Id.*

This federal case is also not the first time Mr. Dobbelmann was investigated for online distribution of child pornography. In 2018, the Minnesota Bureau of Criminal Apprehension (BCA) initiated an investigation of Mr. Dobbelmann after receiving multiple CyberTipline reports from Instagram of Dobbelmann uploading content such as a child "under the age of 10 years …laying on her back with her legs spread apart. She has, what appears to be a dog collar, around her neck. An adult male is partially visible between her legs holding her buttocks with his penis penetrating her anus." Ex. 4 (BCA Rep.) at 00001331. The BCA got more and more CyberTip reports that led back to Mr. Dobbelmann, and eventually executed a search warrant at his home. On the seized devices and in his Google and Instagram accounts, the BCA investigator found 2,687 image files and 443 videos of child pornography. The BCA and the FBI discovered they were both investigating Dobbelmann and because of the instant prosecution, Hennepin County elected not to file charges based on the BCA investigation.

## II. Guidelines Calculations

The parties' Guidelines stipulations match the calculations in the PSR. The total offense level is 38 and the criminal history category is IV, leading to a Guidelines range of 324 to 360 months (as capped by the 30-year statutory

9

maximum).  PSR ¶ 114; Plea Agreement ¶ 7f.  The count of conviction carries a

mandatory minimum sentence of 15 years. 18 U.S.C. § 2251(e).

## III.   Sentencing Recommendation

For the reasons set forth below, the government recommends a sentence of

324 months' imprisonment, followed by at least 20 years of supervised release.

Based on the unique case before the Court, this sentence is sufficient but not

greater than necessary to comply with 3553(a)(2).  It appropriately reflects the

gravity of the offense, and the serious danger Mr. Dobbelmann poses to the

community. It accounts for Mr. Dobbelmann's history of incessant, egregious

offending against children, would promote respect for the law, and would render

just punishment.

### A. The 3553(a) factors call for a sentence that reflects the gravity of the offense and addresses the danger the defendant presents.

1. *The nature and circumstances of the offense and the need to provide just punishment*

Mr. Dobbelmann's offense is the kind that devastates victims and tears at

society. He relentlessly solicited sexually explicit videos and photos from

vulnerable teenaged and preteen girls he targeted online. And he did not take no

for an answer. He was incessant, sending thousands of messages to young girls,

many of whom revealed their ages to him and even told him to stop, calling him

a pedophile. Yet, he bombarded them with lewd, graphic sexual text, photos of his penis, and bribes for the sexual content he sought.

As the small sample of excerpts in the PSR and Exhibit 1 illustrate, Mr. Dobbelmann wrote horrifyingly graphic messages to children he knew to be 11, 12 or 13 years old. To 11-year-old Minor 4, along with an image of an erect penis her wrote: "This is me Right Now thinking about how incredible it would feel having my rock hard cock sliding deep inside you with your smooth sweet tight wet pussy wrapped around my hard cock … as I then continue to slide in&out a lil faster and faster till I'm thrusting my cock in &out over&over till your erupting in intense orgasmic pleasures surging thru your entire body and you feel my cock explode deep inside you instantly filling up with my huge load if cum & it gushes out your pussy from around my cock still inside your throbbing & pulsating pussy for the first time…" PSR ¶ 17.

It is hard to express the profligacy and consistency with which Mr. Dobbelmann sent such obscene, graphic message to girls, knowing they were minors and begging them to return the imagery. *E.g.*, Ex. 1. And we know that Mr. Dobbelmann sought to make his imagined encounters a reality, as he took Minor 2 to be his "girlfriend" and claimed he was moving to California to be with her. Knowing she was 12 years old, he bought her lingerie and set up an account for her to sell herself on OnlyFans. He also talked to other minors about wanting to

11

meet up and have sex, just as he had done in 2007 that lead to his obscenity conviction. *See, e.g.*, PSR ¶¶ 15, 19, 51; Ex. 1 at 6, 12, 17. This is a frightening picture of willingness to act on sexual attraction to children.

But it did not stop there. In addition to directly targeting minors, Mr. Dobbelmann joined online communities of pedophiles where he embraced sexual abuse of children, sharing, trading, joking about, and relishing child sex abuse images. Mr. Dobbelman went so far as to ask an undercover officer for sex with his purported nine-year-old daughter and five-year-old son. He then bragged to the UC that the video he had just sent was him having sex with his wife and two nine-year old girls.

This celebration and tireless pursuit of child exploitation is staggering in breadth and horrifying in reach. Mr. Dobbelmann sent his chat companions violent images of child rape while simultaneously harassing and soliciting new sexual content from girls he sought out online. He collected, emailed, and posted so much child pornography, the CyberTipline Reports could barely keep up. And he targeted so many minors, just *one* of his SnapChat accounts alone contained more than 12,000 separate messages in less than a year. *See* Ex. 1 at 1.

By causing and soliciting the production of new files, Mr. Dobbelmann expanded the tragic world of online child pornography. Sexualizing children as young as 11 and 12, and sending them obscene images, he infected the spirits and

minds of his victims with things that cannot be unseen, cannot be unfelt. And his online trading inflicted repeated and ongoing harm to the victims in those images of abuse, while also making these materials available to others to continue the cycle.

The Court is well aware how devasting child sexual abuse is to its victims and how the victims of online trading are forced to relive the pain again and again and again. Mr. Dobbelmann trafficked images and videos of children who "cannot escape [their] victimization, and … can never put in in the past because it is ongoing." *Victim Impact Statement from Mother of "Pia,"* PSR at 12. "Jenny" writes, "I went to therapy for a while but I stopped because I just wanted to forget it. With the pictures out there I can't." PSR at 11. As victims and parents of victims uniformly tell the Court, online exchange of child pornography keeps the pain alive, as these children are constantly reminded of their abuse and unable to heal.

Furthermore, the series victims movingly write of how they continue to live in fear that strangers have seen the recordings of their sexual abuse; they cannot trust, they cannot interact like other human beings who were spared such degradation and pain. As one mother wrote, it "makes me sick just to imagine that these images are on sale, or for trade, circulating from one person to another pedophile. I feel hopeless and helpless because I can't do anything about it to stop the spread, and neither can anyone else." *Victim Impact Statement of Mother of*

"*Maria*," PSR at 21. All the Victim Impact Statements before the Court express similar sentiments about the inability to escape the trauma and the fear, and the self-loathing, anxiety, and distrust that result.

As these victims know too well, the trafficking of child sex abuse material contributes to this harm and creates a distinct, renewed harm with each viewing and sharing. *See United States v. Weis*, 487 F.3d 1148, 1153 (8th Cir. 2007). And this is on top of nearly insurmountable trauma. Survivors of child abuse and exploitation report higher rates of PTSD, suicide, anxiety, depression, eating disorders, and other disorders.[3] Tragically, children rarely recover completely from the trauma of sexual abuse. A. Perry and D. DiLillo, *Child Sexual Abuse*, 147, in NA. Jackson, Encyclopedia of Domestic Violence, (2007). The offense at hand is grave, it is extensive, and it requires serious punishment. The government's requested sentence will justly punish this crime.

    2.  *The history and characteristics of the defendant and the need to protect the public*

Mr. Dobbelmann's history and characteristics likewise support a lengthy term of imprisonment. He exploited children online for years in most every way

---

[3] *See, e.g.*, Molnar, B. E., Berkman, L. F., & Buka, S. L., *Psychopathology, childhood sexual abuse and other childhood adversities: Relative links to subsequent suicidal behaviour in the US*, Psychol. Med., 31, 965–77 (2001); Paolucci, E. O., Genuis, M. L., & Violato, C., *A meta-analysis of the published research on the effects of child sexual abuse*, J. of Psychol., 135(1), 17–36 (2001); Putnam, F. W., *Ten-year research update review: Child sexual abuse*, J. Am. Acad. of Child and Adolescent Psych., 42(3) (2003).

imaginable. He was so prolific that he was discovered independently by both the BCA and the FBI, not even stopping after the BCA searched his house and interviewed him.  He has shown himself uninterested in or incapable of changing.

Mr. Dobbelmann's 2008 conviction for distribution of obscene material, though not enhancing his mandatory minimum in this case, demonstrates how long he has been targeting and soliciting sex from children and the consistency of his conduct.  In that case, Mr. Dobbelmann found a 15-year-old on Yahoo! instant messenger and after learning her age, asked if she had ever had "a3some." ECF 29-1 at 5; PSR ¶ 51. He asked the child if she had "any sexy nude pix" he could see, saying "But don't you wanna get together with me and have a threesome?" *Id*. Mr. Dobbelmann then sent the victim photos including an erect penis and vaginal penetration and wrote, "wanna have me inside you?" ECF 29-1 at 5 When she replied about being underage and asked if it was ok, Mr. Dobbelmann told her it would be "way illegal" for them to have sex. *Id*. at 6. At the time, Mr. Dobbelmann was working at the Winona County Jail, having gotten a degree in sociology and criminal justice/law enforcement. PSR ¶¶ 51, 88. Because of this conviction, Mr. Dobbelmann was and remains required to register as a sex offender. PSR ¶ 51.

This conviction shows that Mr. Dobbelmann had been trying to have sex with children for at least 14 years when he was finally caught here. And it reveals how little Mr. Dobbelmann respects the law. Mr. Dobbelmann received a sentence

of probation and violated it multiple times by failing to complete treatment, accessing social media without approval, accessing pornography, and failing to remain law-abiding. These three violations in such a short time show a total disregard for the law and an apparent inability to stay offline and away from sexual material.

The final violation, for failure to remain law abiding, is also greatly concerning, as it was based on the defendant's conviction for interfering with a 911 call after he and his then wife were physically fighting. PSR ¶ 52. On another incident, his wife reported that Mr. Dobbelmann punched her in the eye, hung her over the balcony, and took her phone, all in the presence of their children. *Id*. ¶ 58. Months later, Mr. Dobbelmann broke in on his wife and struck her companion with a baton, leaving him covered in blood and lacerated on the head. PSR ¶ 53. For this, Mr. Dobbelmann was convicted of second-degree assault and again violated probation, this time by getting into a physical altercation with his wife, possessing dangerous weapons and law enforcement equipment (throwing stars, throwing spikes, ammunition, and a Winona County Sheriff's Office badge), and, once again, possessing sexually explicit materials. *Id*.

Mr. Dobbelmann also has a felony conviction for violating his predatory offender registration requirements, after he moved away from his parents' home

16

and never updated his registration. PSR ¶54. Here, again, Mr. Dobbelmann had multiple probation violations.

This history and these characteristics paint a vivid picture of Mr. Dobbelmann's great danger to society. He has demonstrated time and again that he has a sexual interest in children and an unrelenting propensity to act on that desire. He has shown with repeated actions that he has no respect for the law, no respect for the rules and requirements of probation and registration, and is volatile and violent. He has also made clear that he will not stop accessing the internet and possessing sexually explicit material.

We add to this background the extreme intensity of his obscene, harassing communications to minors in the instant case, and messages to the UC, and the gravity of the danger skyrockets. Children will not be safe with Mr. Dobbelmann at liberty. A terms of 324 months' imprisonment accounts for Mr. Dobbelmann's history of flagrant child sexual exploitation and disregard for rule of law. Importantly, and in conjunction with intensive treatment that must occur, it will also protect the public from future harm at the defendant's hands.

3. *The need for deterrence*

Mr. Dobbelmann will be deterred by a sentence of 324 months.  This is much more time than he has faced previously and will give him the opportunity to undergo treatment for sexual offending and for drug addiction. He has shown by

his prior sentences and string of probation violations that he will not be deterred by anything less than significant prison time.

This sentence will also effect general deterrence, a key sentencing goal of our justice system. *See Ferguson v. United States*, 623 F.3d 627, 631 (8th Cir. 2010); *United States v. Medearis* 451 F.3d 918 (8th Cir. 2006). The Court can send a message to those who target children online and to those who join chat groups and forums dedicated to the sexual exploitation of children. Online solicitation of children is tragically common, with little to prevent adults like Mr. Dobbelmann from connecting with young, and often vulnerable girls. Similarly, pedophilic groups like those Mr. Dobbelmann joined to trade child pornography and discuss the abusing children are rampant and need to be deterred. Crimes like Mr. Dobbelmann's cause deep and lasting damage to our society and its most

vulnerable members. A sentence in this case must be strong enough to ensure general deterrence, as well as promote respect of the law.

    4. *The need to provide correctional treatment in the most effective manner.*

Untreated, Mr. Dobbelmann has shown he will not stop exploiting children. The government requests that the Court recommend placement at one of the BOP's residential sex offender treatment programs, at Marion in Illinois or FMC Devens in Massachusetts. While incarcerated, Mr. Dobbelmann will also have the opportunity to seek substance abuse treatment for his methamphetamine addiction. *See* PSR ¶¶ 71, 82.

    5. *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.*

Child exploitation crimes are among the most egregious offenses and courts have routinely upheld lengthy sentences in these cases. And while sometimes the government seeks a downward variance in child pornography Guidelines to bring the case in line with prior requests and sentences, here it is important to remember that the plea agreement has done this work in advance, rendering the Guideline range appropriate and consistent with sentences in like cases. By pleading guilty to one count of attempted production, Mr. Dobbelmann benefitted from much lower Guidelines and sentencing exposure than he would have had after trial or even with a plea to multiple counts. Speaking to the conduct encompassed in his crimes, Mr. Dobbelmann would have faced a Guideline sentence of 90 years'

imprisonment. *See* U.S.S.G. §§ 2G2.1, 2G2.2, 4B1.5(b)(1). He would have had mandatory minimums of 15 years on each of the attempted production counts, and a 10-year mandatory consecutive sentence for the § 2260A charge because Mr. Dobbelmann committed Counts 1, 2 and 4 while being required to register as a sex offender. *See* 18 U.S.C. § 2260A.

Mr. Dobbelmann should, of course, get the benefit of his plea agreement. That is just what a Guidelines sentence does here. A sentence at the bottom of the 324-360 Guideline range correctly accounts for Mr. Dobbelmann's specific offense characteristics, history, and conduct while granting him avoidance of more severe penalties.

Such a sentence also comports with sentences in other child pornography production cases in which the defendant pleaded guilty to 18 U.S.C. § 2251(a) with similar conduct. For example, in *United States v. Alan Wolff,* 19-cr-126 (JRT/DTS), over the course of years Wolff engaged in communications with dozens of minors in the Philippines, ranging in age from about thirteen to seventeen years old. Wolff requested and received images of child pornography from these minors. Knowing these children were poor and needed the money for things like food and school Wolff paid them for images, usually in payments of about $35-$50. With some of the minors, he considered himself to be in a "relationship" with them and threatened them when they appeared to engage in age-appropriate relationships.

20

Wolff also sent many of the minors pictures of his penis or videos of himself masturbating. Wolff's Guideline was 720 months' imprisonment, and the government sought a sentence of 360 months. The Court imposed 264 months of imprisonment.

In *United States v. Witry*, 18-cr-310 (NEB/LIB), the defendant contacted more than 200 minors ages 13-17 and tried to bribe many with alcohol, cigarettes, and clothing in exchange for nude images. Witry met the minors on Snapchat and other social media cites while posing as a teenaged boy (he was actually in his mid-twenties).  Like Dobbelmann, he was prolific in his solicitations, had a prior offense of similar conduct, and violated probation. He bribed his online contacts to meet, and when they did, he sexually assaulted at least three victims. The government recommended a sentence of 420 months' imprisonment, and the Court sentenced the defendant to 472 months' imprisonment.

In *United States v. Pierson*, 544 F.3d 933 (2008), the defendant was convicted of online solicitation of just one minor – the 14-year-old persona of an undercover officer. Pierson used multiple false identities to try to get sexually explicit images and sex from "Brenda." As here, his Guidelines were 324-405 months. *Id*. at 937. He received a sentence of 300 months' imprisonment. *Id*. at 938. Unlike Mr. Dobbelmann, his conduct was limited to one (pseudo) victim, and he did not send

21

child pornography to and have discussions about wanted to have sex with the child of an undercover officer.

Like the defendants in these cases, Mr. Dobbelmann targeted vulnerable minors online for sexual images in an unrelenting manner and tried to bribe them for sexual images. Like these defendants, he sought to meet his minor victims, and expressed his desire for sex with children repeatedly. And like Witry, Mr. Dobbelmann did this with a prior record of similar conduct and of utter disregard for the law. Unlike these defendants, Mr. Dobbelmann also trafficked child pornography over a period of years, joining communities of abusers and sending and seeking previously produced child sex abuse material. Thus, in their similarities and in their differences, these cases demonstrate that a sentence of 324 months reflects warranted disparities and avoids unwarranted disparities. *See* 18 U.S.C. § 3352(a)(6).

## B. The government requests at least 20 years of supervised release.

The law requires at least five years of supervised release and permits the imposition of lifetime supervised release. *See* 18 U.S.C. § 3583(k). In sex offenses like this case, the guidelines advise the maximum term of supervised release, recognizing the danger posed by those driven to sexual gratification at the expense of children. *See* U.S.S.G. § 5D1.2(b) (Policy Statement). The danger Mr.

Dobbelmann poses is clear. The government requests sufficient supervision to ensure he does not resume old patterns.

### C. The requested sentence furthers the need to provide restitution to victims of the offense.

Mr. Dobbelmann must make restitution to the victims of his crime. 18 U.S.C. §§ 2259 & 3663A. Restitution is mandatory in this case and the parties agree regarding prospective requests for restitution. Plea Agreement ¶ 10. Mr. Dobbelmann agreed to pay full restitution to any victim in the images and videos he trafficked or possessed and to enter into a stipulation with victims who make requests prior to sentencing. *Id*. He will pay restitution of at least $3,000 per victim. *Id*. The government understands that Mr. Dobbelmann's attorney has negotiated with victims' counsel and is working on agreements that will be part of a global stipulation.

### D. The JVTA assessment also applies.

Mr. Dobbelmann is also subject to a special assessment of $5,000 under the Justice for Victims of Trafficking Act of 2015 ("JVTA"). *See* 18 U.S.C. § 3014; Plea Agreement ¶ 5g. Under the JVTA, the Court must impose this assessment on any "non-indigent person" convicted of a child exploitation crime. 18 U.S.C. § 3014(a)(3). In *United States v. Kelley*, 861 F.3d 790 (8th Cir. 2017), the Eighth Circuit held that "non-indigency" must consider both a defendant's current assets and his

future earning potential. *See id*. at 801-02. Under this standard, Mr. Dobbelmann is not indigent, and the assessment should apply.

The government does not dispute that currently Mr. Dobbelmann is indigent. He has no recent employment and no assets. PSR ¶¶ 92, 110. However, he has a post-secondary degree, has worked many jobs, and is relatively young, such that he has future earning potential. Additionally, a $5,000 obligation would not significantly impact Mr. Dobbelmann's ability to support himself. At the same time, it provides a meaningful contribution to compensate victims of crimes like those he committed. If the Court imposes the JVTA assessment, the government asks that it be payable monthly and come due only after payment of restitution is complete. *See* 18 U.S.C. § 3014(b).

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court impose a sentence of 324 months' imprisonment, a term of at least 20

years of supervised release, restitution, and an assessment under the AVAA of $5,000.

24

Dated:  July 14, 2022                                 Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*s/Sarah E. Hudleston*

BY:  SARAH E. HUDLESTON
Assistant U.S. Attorney
Attorney ID No. 0351489